UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Steven Brian Alker

      v.                             Civil No. 13-cv-221-JD
                                      Opinion No. 2014 DNH 032
Carolyn W. Colvin,[1]
Acting Commissioner,
Social Security Administration


O R D E R

Steven Brian Alker seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the decision of the Commissioner of the Social Security Administration, denying his application for disability insurance benefits under Title II and supplemental security income under Title XVI.  Alker contends that the Administrative Law Judge ("ALJ") improperly assessed Alker's treating physicians' opinions, which led to incorrect findings that, if Alker stopped abusing alcohol and cocaine, he would not have an impairment that met or equaled a listed impairment and he could perform work which existed in significant numbers in the national economy.  The Acting Commissioner moves to affirm the decision on the grounds that substantial evidence supports the ALJ's decision.

---

[1]Carolyn W. Colvin became the Acting Commissioner on February 14, 2013, and is substituted automatically as the defendant pursuant to Federal Rule of Civil Procedure 25(d).

Background

Alker applied for social security disability insurance benefits and supplemental security income on August 5, 2010, alleging a disability as of October 7, 2008.[2]  Alker claimed a disability due to bipolar disorder, degenerative disc disease, bulging discs in his lumbar spine at levels L4/L5, depression, anxiety, panic attacks, insomnia, paranoia, alcohol and cocaine abuse, cirrhosis, and gout.

A.   Back Pain

From August of 2010 through January of 2012, Alker saw several practitioners for treatment of his back pain, which resulted from a car accident in the mid-1990s.  Alker saw Dr. Dean Morris in August and September of 2010 with complaints of abdominal pain and back pain.  Dr. Morris noted that Alker's back revealed no abnormality upon inspection, and that Alker had no kyphosis, scoliosis, posterior tenderness, or pain upon a straight leg raising test while in the supine position.  In addition, although Dr. Morris saw Alker for complaints of physical pain, he noted that Alker had no unusual anxiety or evidence of depression.

_____

[2]On May 24, 2012, Alker wrote the ALJ a letter amending his disability onset date from October 7, 2008, to August 5, 2010. In the ALJ's opinion, he states that Alker's alleged disability onset date is October 7, 2008.

2

On November 17, 2010, Dr. Frank Graf diagnosed Alker with chronic discogenic lumbosacral pain with intermittent radiation into the left lower extremity with partial radicular pain at level L5 patterning into the right leg.  Dr. Graf opined at that time that Alker was impaired in bending, stooping, lifting, carrying, pushing, and pulling due to orthopedic changes in the lumbosacral spine.

On December 9, 2010, state agency reviewing physician, Dr. Hugh Fairley, assessed Alker's physical residual functional capacity from his medical records.  Dr. Fairley concluded that Alker could occasionally lift twenty pounds and frequently lift ten pounds.  Dr Fairley also opined that Alker could stand or sit for six hours in an eight-hour workday.  Dr. Fairley found that Alker "is considered capable of fulltime work."

Alker had an MRI and an x-ray of his spine on January 2, 2011.  Both procedures showed spinal stenosis, a disc degeneration, and a bulging disc.

Alker saw Dr. Ashton Stanton in January and March of 2011, with complaints of lower back pain that radiated down his left leg, which left his left leg weak and immobile.  Dr. Stanton noted in January that Alker was in no acute distress, had no muscle atrophy in the lumbar spine or lower extremities, had a well-balanced and coordinated gait, had moderately restricted range of motion of the lumbar spine upon extension and side-bending, and had five out of five muscle strength in the lower extremities.  Dr. Stanton diagnosed Alker with lower back pain

3

caused by a symptomatic disc bulge at level L4-5.  In January, Alker was prescribed a course of physical therapy focusing on neutral spine core strengthening with a home exercise program. In March, Dr. Stanton gave the same diagnosis and prescription, instructed Alker to continue with physical therapy and home exercise, and told Alker to begin an independent routine of aerobic exercise, including gentle distance walking on a treadmill.

Alker attended several physical therapy sessions for his back at Exeter Hospital in February and March of 2011.  During his first visit, Alker stated that his pain was between a four and ten on a ten-point scale, and that he could only sit for ten minutes without disturbance and could not stand for any length of time.  He stated that one of his goals was to sleep for at least four hours without waking due to pain.  Upon discharge from the program on March 9, 2011, Alker reported that his pain was between a zero and two on a ten-point scale, that he could sleep for four hours, stand for one hour, and sit for one to two hours without disruption.  Alker was told to follow up with a physician for further evaluation and to continue with an independent home exercise program.

On April 26, 2011, Dr. Graf completed a Medical Source Statement of Ability to do Work-Related Activities form.  Dr. Graf opined that Alker was limited to lifting or carrying up to ten pounds occasionally.  Alker had sit, stand, and walk limitations of twenty, thirty, and twenty minutes, respectively.

4

He could sit for eighty minutes in an eight-hour day, stand for 120 minutes, and walk for eighty minutes.  Dr. Graf opined that Alker could not shop, walk a block, use public transportation, prepare meals, or feed himself.  He further opined that Alker would need to frequently miss work due to his pain, and that his ability to maintain attention and concentration on work tasks would be compromised by pain.

On December 12, 2011, Alker saw Hugh Cochran, a certified registered nurse, at Paincare Centers, for complaints of pain in his left leg and back.  Cochran found that Alker was in no acute distress, had a normal gait, and had a normal range of motion and strength in the extremities with no joint enlargement or tenderness.  Cochran diagnosed Alker with a muscle spasm, facet joint arthopathy, lumbago, and lumbar radiculopathy.

On December 14, 2011, Alker received an epidural steroid injection in the lumbar spine.  Alker saw Cochran on December 23, 2011, who gave the same diagnosis as he did on December 14.

On January 11, 2012, Alker saw Dr. Graf, who diagnosed Alker with lumbosacral pain with left lower extremity radiculopathy. Dr. Graf opined that Alker's pain was severe, that pain caused him to need to alter his daily activities, and that pain was present with minimal activity.  Dr. Graf also found that Alker's pain was enhanced by stress and compromised his ability to deal with work stresses, required him to miss work and take frequent rest periods, and frequently compromised his ability to maintain attention and concentration on work tasks throughout an eight-

5

hour day.  Dr. Graf stated that Alker's medications frequently
compromised his ability to maintain attention and concentration,
that he was not capable of engaging in any type of employment on
a sustained, regular, and competitive basis for eight hours a
day, forty hours per week, and that he was not capable of
engaging in part-time employment on a sustained and regular
basis.  Dr. Graf also stated that Alker's limitations had existed
since October 7, 2008.


B.   Mental Health and Substance Abuse

    Alker began seeking treatment for complaints of anxiety,
depression, paranoia, hallucinations, and alcohol and cocaine
abuse in July of 2010.  On July 28, 2010, Alker was seen at
Seacoast Mental Health Center ("SMHC"), seeking assistance in
staying sober because he had recently used alcohol and cocaine.
Later that day, Alker was seen at Exeter Hospital for complaints
of anxiety, depression, paranoia, and visual hallucinations.

    On September 8, 2010, Alker was seen at Exeter Hospital for
complaints of suicidal thoughts and a possible overdose of drugs
and alcohol.  Alker also complained of severe feelings of
withdrawal, mood swings, anxiety, and depression.  He was
diagnosed with depression and polysubstance abuse, and was
instructed to avoid alcohol and receive outpatient treatment for
his abuse.

    On October 14, 2010, Alker saw Tracie Warner, a mental
health social worker at SMHC, for an initial evaluation.  Alker

was diagnosed with a mood disorder, alcohol dependence in early-partial remission, cocaine dependence in early-full remission, and a note to rule out psychotic disorder.  Warner prescribed a course of individual psychotherapy sessions.  From October of 2010 though March of 2012, Alker attended psychotherapy sessions with Warner several times a month.

During Alker's sessions in October through December of 2010, Warner noted that Alker learned how to identify his symptoms and appeared committed to his recovery.  At that time, Alker experienced anxiety, depression, and hallucinations, and occasionally blacked out and suffered panic attacks.  Beginning at the end of November of 2010, Warner noted that Alker appeared "stable" or "reasonably stable" during each session and instructed him to continue with his current treatment plan.

On October 19, 2010, Dr. Sandra Vallery, a clinical psychologist, performed a consultative examination of Alker, who complained of bipolar disorder, depression, anxiety, and substance abuse.  Alker told Dr. Vallery that he had been treated for an alcohol and valium overdose a month prior to the exam, and that he drinks to alleviate his anxiety and depression.  Alker also stated that he started drinking when he was thirteen years old and started abusing cocaine when he was seventeen years old.

Upon exam, Alker had an anxious mood and a constricted affect, and he reported audio and visual hallucinations, paranoia, and passive suicidal ideations.  Dr. Vallery noted that Alker had fair insight, fair to good judgment, and no cognitive

7

impairment.  Dr. Vallery conducted a Folstein Mini Mental Status
Examination on which Alker scored a 28 out of 30.  Dr. Vallery
stated that Alker was unable to tolerate stresses common to the
work environment or maintain attendance.  She further stated that
Alker would have difficulty with short and simple instructions.
Alker was diagnosed with alcohol abuse, panic disorder with
agoraphobia, major depression, social phobia, and cirrhosis of
the liver.  Dr. Vallery recommended psychotropic medications for
anxiety and depression, therapy, and that Alker continue
attending Alcoholic Anonymous ("AA") meetings.  She did not
provide an opinion regarding the impact of substance abuse on
Alker's disability.

On October 26, 2010, Dr. Patricia Salt, a state agency
psychologist, reviewed the record and completed a Psychiatric
Review Technique form.  Dr. Salt noted that Alker had "depressive
syndrome," an anxiety-related disorder, severe panic attacks,
thoughts of suicide, hallucinations, and paranoid thinking.  Dr.
Salt also opined that if Alker worked in a setting that did not
require regular interaction with groups of people, he could
"perform activities within a schedule and maintain regular
attendance," and work a normal forty-hour workweek without
interruptions.

On November 22, 2010, Alker saw Dr. John Miller,
complaining of chronic pain, anxiety, depression, panic attacks,
poor memory, auditory and visual hallucinations, and paranoia.
Alker was cooperative, alert, and oriented, with a normal gait,

8

no abnormal movements, symmetrical and normal motor strength,
good attention, reasonable insight, impaired judgment, sad
affect, poor long-term memory, logical thought processes, self-
described hallucinations and paranoia, and no suicidal or
homicidal ideation.  Alker was diagnosed with mood disorder,
alcohol dependence, and cocaine dependence in full-sustained
remission.

    Alker saw Dr. Miller again on December 13, 2010, and January
3, 2011.  During both exams, Dr. Miller noted that Alker was
cooperative, alert, and oriented; had good attention, limited
insight, and adequate judgment; was anxious and depressed; and
had a congruent affect, grossly intact cognition, logical thought
processes, no evidence of any psychoses, and no suicidal or
homicidal ideation.

    Alker was prescribed several medications throughout 2010,
2011, and 2012.  He was prescribed Zoloft, which helped him with
his anxiety and depression.  He was also prescribed Neurontin,
which, at the proper dosage, helped to relieve his anxiety, but
also sometimes caused significant sedation and weight gain.[3]

    From January through the middle of April of 2011, Warner's
treatment notes from Alker's psychotherapy sessions indicate that
Alker was doing well and largely feeling much better than he did

─────────────

    [3]Alker was also prescribed Trilafon, which he took
throughout 2011.  The Joint Statement of Material Facts does not
state why Trilafon was prescribed or what effect it had on Alker.

when he first started his sessions with her back in October of
2010.  Although Alker reported some anxiety, Warner often noted
improvement and commented after each session that Alker was in a
reasonably stable mood.  After each session, Warner instructed
Alker to continue with his current treatment plan.

During his sessions with Warner on April 21, 2011, and April
28, 2011, Alker reported visual and auditory hallucinations, some
of which were "disturbing," and continued anxiety attacks.  His
anxiety and hallucinations, however, decreased in May and June of
2011.  Alker told Warner on May 20, 2011, that he had a relapse
with alcohol, but immediately began going to AA meetings.  Warner
continued to note, despite Alker's hallucinations and anxiety,
that he was in a reasonably stable mood, and she instructed him
to continue with his current treatment plan.

On June 20, 2011, Dr. Miller and Warner completed a Medical
Source Statement of Ability to do Work-Related Activities form.
They indicated on the form that Alker had marked to extreme
issues in understanding and memory, sustained concentration and
persistence, and social interaction.  They also opined that Alker
had extreme issues in adaptation, including with the ability to
respond appropriately to changes in the work setting, the ability
to make realistic goals, and the ability to make plans
independently of others.  Warner further stated that since August
21, 2008, Alker had extreme limitations in his ability to
remember locations and work-like procedures, carry out detailed
instructions, maintain attention and concentration for extended

period, perform activities within a schedule, and maintain regular attendance.

From July through October of 2011, Alker often reported anxiety and hallucinations during his psychotherapy sessions with Warner.  In September, Alker reported that a change in medication helped to significantly reduce the frequency of his hallucinations.  In October, Alker expressed concern about the cancellation of his state benefits, but was attempting to remain positive and handle stress without drinking alcohol.  After each session, Warner noted that Alker was reasonably stable in mood and instructed him to continue with his current treatment plan.

In November of 2011, Dr. Miller referred Alker to SMHC for cognitive evaluation.  On November 10, 2011, Dr. Karen Pearson, Licensed Psychologist Supervisor, and Michael Valenti, a Psychology Intern, of SMHC, provided a Psychological Testing Report ("PTR") based on their assessment of Alker.  During the three hour assessment, Valenti described Alker as cooperative, engaged, and focused.  Valenti also described Alker as exhibiting a dysphoric mood with slightly restricted affect.

The PTR showed that Alker had cognitive impairment sufficient in severity to limit academic, occupational, and social pursuits.  Among other examinations, Dr. Pearson administered the Wechsler Adult Intelligence Scale Exam - Fourth Edition ("WAIS-IV").  On the WAIS-IV, Alker scored in the bottom 5% on the Perceptual Reasoning Index, which showed limited cognitive flexibility, abstract problem solving, and pattern

recognition.  He also scored in the bottom 13% in Working Memory
Index, and in the bottom 14% in Processing Speed Index.  Dr.
Pearson opined that Alker suffered from post traumatic stress
disorder.

From November of 2011 through January of 2012, Alker
generally reported during his psychotherapy sessions that,
although he continued to experience anxiety about being in public
places and had hallucinations, he was doing reasonably well and
attending AA meetings.  He reported going to the gym to work out
often in an attempt to deal with stress and lose weight, but he
reported pain from his workouts.  In December of 2011, Alker told
Dr. Miller and Warner that he felt he was gaining weight because
of Neurontin, and so stopped taking the medication.  In January
of 2012, Alker stated that his symptoms were returning and
getting worse after he stopped taking Neurontin, and that he was
experiencing anxiety and was constantly stressed.  After each
psychotherapy session, Warner noted that Alker was stable and
instructed him to continue with his current treatment plan.

From February through March of 2012, Alker reported to
Warner that his current dosage of Neurontin, which he began
taking again but at a lower dosage than in 2011, was working well
and helping to reduce his anxiety and hallucinations.  In
February, he reported increased anxiety about his Social Security
disability appeal, and expressed regret about being unable to go
to the gym because of financial concerns and pain in his back.

Warner noted after each session that Alker was stable and
instructed him to continue with his current treatment plan.

On May 12, 2012, Dr. Miller opined that "Mr. Alker has been
disabled by his severe anxiety, depression, personality
dysfunction, and cognitive limitations since well before he began
abusing alcohol at the age of 13."  Dr. Miller also noted that
"[d]espite [Alker's] abstinence from both the alcohol and
cocaine, he continues with significant symptoms of anxiety and
depression, which I continue to treat with pharmacotheraphy, and
which continue to be quite disabling for him."  He further opined
that Alker's depression and anxiety pre-dated his substance
dependence.

C.   Procedural Background

After his application was denied on initial review, Alker
requested a hearing before an ALJ which was held on May 22, 2012.
Alker was represented by counsel and testified at the hearing.
In addition, an impartial medical expert, Dr. Stuart Gitlow, and
a vocational expert, Ruth Baruch, testified.

The ALJ issued a decision on June 15, 2012, denying
benefits.  The ALJ found that if Alker stopped his substance
abuse, he would not have an impairment or combination of
impairments that met or equaled a listed impairment.  He also
found that if Alker stopped his substance abuse, he would have
the residual functional capacity to perform work that existed in
significant numbers in the national economy.

13

As a result, the ALJ concluded that Alker was not disabled. The Appeals Council denied Alker's request for review on December 11, 2012, making the ALJ's decision the final decision of the Acting Commissioner.

Standard of Review

In reviewing the final decision of the Commissioner in a social security case, the court "is limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999); accord Seavey v. Barnhart, 276 F.3d 1, 9 (1st Cir. 2001). The court defers to the ALJ's factual findings as long as they are supported by substantial evidence. § 405(g). "Substantial evidence is more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Astralis Condo. Ass'n v. Sec'y Dep't of Housing & Urban Dev., 620 F.3d 62, 66 (1st Cir. 2010).

Disability, for purposes of social security benefits, is "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

months." 20 C.F.R. § 404.1505(a).[4]  The ALJ follows a five-step

sequential analysis for determining whether a claimant is

disabled.  Id. at § 404.1520.  The claimant bears the burden,

through the first four steps, of proving that his impairments

preclude him from working.  Freeman v. Barnhart, 274 F.3d 606,

608 (1st Cir. 2001).  At the fifth step, the Commissioner

determines whether other work that the claimant can do, despite

his impairments, exists in significant numbers in the national

economy and must produce substantial evidence to support that

finding.  Seavey, 276 F.3d at 5.


Discussion

     The ALJ concluded that Alker would not be disabled if he

stopped his substance abuse.  Specifically, the ALJ found at Step

Three that without engaging in substance abuse, Alker did not

have an impairment or combination of impairments that meets or

medically equals a listed impairment.  The ALJ also found at Step

Five that if Alker stopped his substance abuse, he could perform

work that existed in significant numbers in the national economy.

Alker contends that these findings are not supported by

---

     [4]The Social Security Administration promulgated regulations
governing eligibility for disability insurance benefits at Part
404 and for supplemental security income at Part 416.  Because
the regulations are substantially the same, the court will cite
only to the disability insurance benefits regulations.  See
McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1120
n.1 (1st Cir. 1986).

substantial evidence, and that the ALJ improperly assessed
Alker's treating physicians' opinions.

If the ALJ finds a claimant is disabled and there is medical
evidence of drug addiction or alcoholism, the ALJ must determine
whether the drug addiction or alcoholism is a contributing factor
material to the determination of disability.  20 C.F.R. §
416.935.  The central issue in determining the materiality of
drug addiction or alcoholism is whether the ALJ would find the
claimant disabled even if he or she stopped using drugs or
alcohol.  Id. at (b)(1).  If the claimant's drug addiction or
alcoholism is a contributing factor material to the determination
of the claimant's disability, the claimant is ineligible for
supplemental security income and disability benefits.  See Grogan
v. Barnhart, 399 F.3d 1257, 1264 (10th Cir. 2005); Randall v.
Astrue, 2011 WL 573603, at *1 (D. Mass. Feb. 15, 2011).  In
determining that a claimant's alcoholism or drug addiction was a
contributing factor material to the determination of disability,
the ALJ must identify some medical evidence supporting the
conclusion that a claimant no longer would be disabled if he or
she stopped drinking or taking drugs.  See Sklenar v. Barnhart,
195 F. Supp. 2d 696, 700 (W.D. Pa. 2002).


A.   Step Three

At Step Three of the sequential analysis, the ALJ
compares the medical evidence of the claimant's impairment "to a

16

list of impairments presumed severe enough to preclude any gainful work." Sullivan v. Zebley, 493 U.S. 521, 525 (1990). "If the claimant's impairment matches or is 'equal' to one of the listed impairments, he qualifies for benefits without further inquiry." Id.; § 404.1520(a)(4)(iii).  If not, the ALJ continues on to consider Step Four.

The ALJ found at Step Two that Alker had severe impairments due to degenerative disc disease, obesity, cirrhosis, mood disorder not otherwise specified, alcohol dependence, and cocaine dependence.  At Step Three, the ALJ found that Alker's impairments, including the substance abuse disorders, met Listings 12.04 (Affective Disorders) and 12.09 (Substance Addiction Disorder) of 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ also found, however, that if Alker stopped the substance abuse, his impairments did not meet any of the listed impairments, including Listing 12.04 and 12.09.

Alker contends that he would continue to meet Listings 12.04 and 12.09 absent his substance abuse and that the ALJ's contrary finding is not supported by substantial evidence.[5]  He argues that the ALJ should have given the opinion of Dr. Miller, a treating source, controlling weight, as it was supported by Dr.

_____

[5]Although Alker claimed disability due to physical ailments, such as degenerative disc disease and bulging discs in his lumbar spine, he does not challenge the ALJ's findings that Alker's physical impairments did not meet or medically equal a listed impairment.

Miller's treatment notes and other evidence in the record.  Alker
also argues that the ALJ gave too much weight to Dr. Gitlow's
opinion.  In addition, Alker contends that the medical record as
a whole supports a finding that he had a listed impairment absent
substance abuse, and that the ALJ misinterpreted test results and
medical records from several practitioners.

### 1.   Dr. Miller

Alker argues that "Dr. Miller's opinion is clearly entitled
to controlling weight as a treating source opinion with respect
to the nature and severity of [Alker's] impairments.  His opinion
was well supported by medically acceptable clinical and
laboratory diagnostic techniques . . . . Both his medical records
and records from [SMHC] provide support, documentation and
correlation for his opinion and psychiatric evaluation."  Pl.
Mot. at 3-4.

The ALJ attributes weight to a medical opinion based on the
nature of the relationship between the medical source and the
claimant, the extent to which the opinion includes supporting
information, the consistency of the opinion with the record as a
whole, the specialization of the source, and other factors,
including the source's understanding of the administrative
process and the source's familiarity with the claimant's record.
20 C.F.R. § 404.1527(d); see also SSR 96-2p, 1996 WL 374188 (July
2, 1996).  "[A] treating source's opinion on the question of the

18

severity of an impairment will be given controlling weight so
long as it 'is well-supported by medically acceptable clinical
and laboratory diagnostic techniques and is not inconsistent with
the other substantial evidence in [the] record.'" Ormon v.
Astrue, 2012 WL 3871560, at *4 (1st Cir. Sept. 7, 2012) (quoting
§ 404.1527(d)(2)).

    Dr. Miller concluded that Alker was "extremely limited in
nearly every functional category."  The ALJ gave Dr. Miller's
opinion limited weight because it was inconsistent with both Dr.
Miller's own treatment notes and Warner's treatment notes.  The
ALJ cited Dr. Miller's treatment notes which repeatedly showed
normal mental status examinations, which were inconsistent with
tremendous limitations in mental functioning.  The ALJ also found
that Dr. Miller's opinion was not credible because he opined that
Alker has been disabled since he was thirteen years old, even
though Dr. Miller's treatment notes do not indicate that he
reviewed any medical records concerning Alker's mental health
prior to 2010.

    The ALJ also found that Dr. Miller's opinion was
inconsistent with the observations of other clinicians treating
Alker for physical and mental illnesses, such as Dr. Stanton and
Dr. Morris, both of whom noted normal results.  The ALJ noted
that "[i]t is unlikely that these treating sources, particularly
[Alker's] primary care physician Dr. Morris, would fail to detect

signs of anxiety or depression if [Alker's] symptoms were as severe as Dr. Miller . . . allege[s]."

The ALJ also addressed Dr. Miller's opinion that Alker's mental impairments are not materially affected by his substance abuse and that his symptoms are disabling regardless of the substance abuse.  The ALJ gave this opinion little weight because Alker's mental status examinations had normal results and because the improvement in Alker's condition during periods of sobriety noted by Dr. Miller and Warner, was inconsistent with that opinion.[6]  The ALJ noted, for example, that when Alker had a prolonged period of abstinence, he reported significantly fewer, shorter, and less distracting hallucination episodes.[7]

The ALJ appropriately found that Dr. Miller's opinion was not entitled to controlling or significant weight because the opinion lacked support from the medical record and was not consistent with his own medical notes.  The ALJ properly explained the basis for his decision not to give controlling

--------

[6]Warner, a mental health social worker, is not an acceptable medical source whose opinion can establish a medically determinable impairment.  20 C.F.R. § 404.1513(a).

[7]Alker suggests that the reduction in his hallucinations could have been the result of medication and not the result of ending his substance abuse.  Even if that were the case, however, "[i]mpairments that can be controlled with medication are not disabling."  Phelps v. Astrue, 2011 WL 2669637, at *8 n.7 (D.N.H. July 7, 2011) (citing Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007)).

weight to Dr. Miller's opinions, which complies with his
obligations under the social security regulations.

    2.  <u>Dr. Gitlow</u>

    Alker argues that the opinion of Dr. Gitlow, the independent
medical examiner, was "not entitled to great weight because it is
not supported by the record as a whole." Pl. Mot. at 15. Alker
notes that Dr. Gitlow does not have a treating relationship with
Alker and argues that his criticisms of Dr. Miller's and Warner's
opinions are unfounded.

    An ALJ may obtain an opinion from an independent medical
expert about the nature and severity of the claimant's
impairments. <u>See</u> <u>Keating v. Sec'y of Health & Human Servs.</u>, 848
F.2d 271, 275-76 (1st Cir. 1988); <u>Chapin v. Astrue</u>, 2012 WL
4499273, at *3-*4 (D.N.H. Sept. 28, 2012). In appropriate
circumstances, the opinions of a medical expert retained by the
Commissioner may be given greater weight than other opinions.
<u>Keating</u>, 848 F.2d at 275 n.1. The ALJ uses the same evaluation
process that is used for all medical opinions to decide the
weight of opinions he has commissioned. § 404.1527(e)(2)(iii).

    The ALJ gave great weight to the opinion of Dr. Gitlow, who
testified that Alker's substance abuse was material to the
severity of his impairments. The ALJ found that "Dr. Gitlow's
testimony was particularly persuasive because he identified
specific instances where Dr. Miller's mental status examinations

of [Alker], during periods of prolonged abstinence, showed
relatively normal mental functioning."  For example, Dr. Gitlow
testified that the medical record shows that after May of 2011,
the month when Alker stopped his substance abuse,[8] Alker's
"mental status exams are normal [and] it does not appear that
there would be any significant contribution from his psychiatric
illness in terms of functional impairment."  Admin. Rec. at 55-
56.  Dr. Gitlow cited several of Dr. Miller's treatment records,
including those dated September 28, 2011, December 12, 2011, and
April of 2012, which all show that Alker's mood symptoms were
well treated and show normal results on mental status
examinations.  Id. at 57.  In addition, Dr. Gitlow noted that Dr.
Miller's exams during Alker's brief periods of sobriety prior to
May of 2011, show that Alker's symptoms improved significantly
without substance abuse and were consistent with those after May
of 2011.  Id.

     The ALJ reasonably found that Dr. Gitlow's opinion was
consistent with the record as a whole.  Dr. Gitlow is an expert
in the field of psychiatry and the subspecialty of addiction

---

     [8]The month when Alker stopped engaging in substance abuse is
based on the testimony of Dr. Gitlow, who cited several medical
records in support of that assertion.  Alker does not contest
that finding, although he refers to one of Dr. Miller's records
noting that Alker had been abstinent from cocaine since November
of 2010 and abstinent from alcohol since about March of 2011.
See Pl. Mot. at 4.  If Alker intended to argue that the ALJ erred
in finding that Alker stopped his substance abuse in May of 2011,
that argument was not sufficiently developed.

22

disorder, and he gave a detailed explanation for his opinion and examined the evidence as a whole.  Therefore, Dr. Gitlow's opinion could reasonably be given great weight, and the ALJ did not err in according it that weight.

       3.  <u>Other Evidence</u>

     The ALJ found that, taken as a whole, the medical evidence supported a finding that Alker did not have a listed impairment absent his substance abuse.  Alker contends that the ALJ either ignored or mischaracterized several medical records.  For example, Alker argues that the ALJ misunderstood the PTR authored by Dr. Pearson and Valenti.  Alker contends that the results of the WAIS-IV and Dr. Pearson's comments in the PTR support a finding that Alker has severe functional limitations.  Dr. Gitlow, however, testified that the PTR supported his conclusion that Alker was not disabled absent substance abuse.  Admin. Rec. at 58.  Dr. Gitlow conceded that Dr. Pearson noted that the test showed low functioning in terms of cognitive skills and other symptoms.  <u>Id.</u>  Dr. Gitlow noted, however, that Dr. Pearson's opinion was that Alker's symptoms do not impair his ability to function.  <u>Id.</u>  The ALJ explained that the PTR indicated that Alker has intellectual deficiencies, but reasoned that the results of the testing, when considered in combination with the rest of the record evidence, were consistent with Alker's ability to perform simple routine repetitive work.  Alker does not point

to anything in the record to show that the results of the WAIS-IV, or Dr. Pearson's opinion, are inconsistent with the ALJ's findings.

Alker also criticizes the ALJ's opinion because it is inconsistent Dr. Vallery's opinion in October of 2010 that Alker could not tolerate stresses in the work environment.  The ALJ addressed Dr. Vallery's opinion, and stated that he gave it some weight, but noted that the examination took place when Alker was abusing substances.  Therefore, the ALJ determined that Dr. Vallery's opinion was not particularly relevant to determining whether Alker was disabled absent substance abuse.

Alker further argues that he continued to have hallucinations even when he was sober, which he contends undermines the ALJ's finding that he would not be disabled absent substance abuse.  The ALJ, however, did not state that Alker's hallucinations disappeared when he was sober, but rather only that they were less frequent and shorter in duration.  Dr. Miller's and Warner's treatment notes support that assertion.[9]

The power to resolve conflicts in the evidence lies with the ALJ, not with the doctors or the courts, see Quintana v. Comm'r

---

[9]Alker appears to argue that Dr. Graf's statement in the Medical Source Statement of Ability to do Work-Related Activities form that Alker had "psychological problems for entire life" should have been given great weight.  Dr. Graf's assessment addressed Alker's back pain and he is an orthopedist.  Admin. Rec. at 577.  Therefore, the ALJ did not err in failing to address Dr. Graf's comment.

of Social Sec., 110 Fed. Appx. 142, 145 (1st Cir. 2004), and he
is responsible for making the ultimate determination on whether
Alker is disabled, § 404.1527(d); see also Pariseau v. Astrue,
2008 WL 2414851, at *4 (D.R.I. June 13, 2008) (citing authority).
Taking into account all of the evidence in the record, the ALJ's
opinion at Step Three is supported by substantial evidence.  See
Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765,
769 (1st Cir. 19991) (per curiam) (If the substantial evidence
standard is met, factual findings are conclusive even if the
record "arguably could support a different conclusion.").

B.  Step Five

     At Step Five, the ALJ bears the burden of showing that there
are jobs that the claimant can do despite his impairments.
Seavey, 276 F.3d at 5.  The ALJ found at Step Five that if Alker
stopped his substance abuse, there would be a significant number
of jobs in the national economy that Alker could perform and,
therefore, he was not disabled.  Alker contends that the ALJ
erred at Step Five because that determination was based on an
erroneous residual functional capacity assessment.

     A residual functional capacity assessment determines the
most a person can do in a work setting despite his limitations
caused by impairments.  20 C.F.R. § 404.1545(a)(1).  The
Commissioner's residual functional capacity assessment is
reviewed to determine whether it is supported by substantial

evidence.  Irlanda Ortiz, 955 F.2d at 769; Pacensa v. Astrue, 848
F. Supp. 2d 80, 87 (D. Mass. 2012).

### 1.   Mental Limitations

The ALJ found that, absent substance abuse, Alker's mental
impairments did not preclude him from being able to maintain
focus on simple tasks or preclude him from being able to perform
work that existed in significant numbers in the national economy.
Alker's arguments concerning the ALJ's determination of the
severity of Alker's mental impairments are addressed above.  The
ALJ's opinion in that regard is supported by substantial
evidence.

### 2.   Physical Limitations

With regard to the effect of Alker's back pain, Alker argues
that Dr. Graf's opinion was entitled to great weight, as he had
examined Alker on three occasions and supported his opinion with
medical findings.  The ALJ acknowledged these facts, as well as
Dr. Graf's status a consultative examiner for the Social Security
Administration.  The ALJ gave Dr. Graf's opinion limited weight,
however, because it was inconsistent with Dr. Graf's own notes in
the record.  For example, the ALJ noted that Dr. Graf's first
examination, which was conducted when he was a consultative
examiner for the Social Security Administration, provided a
cursory opinion of Alker's limitations.  When Dr. Graf was

26

retained by Alker, however, Dr. Graf provided a much more detailed assessment of Alker's limitations.  The ALJ also noted that Dr. Graf opined that Alker had severe physical limitations since 1993, even though he did not examine Alker until 2010, Alker alleged a disability onset date in 2008, and Alker had worked as a landscaper after 1993.

The ALJ also noted that Dr. Graf's opinion was inconsistent with other record evidence, such as the opinions of Dr. Stanton and Dr. Morris, both of whose examinations were relatively normal.  The ALJ also cited the opinions of Dr. Fairley and Cochran, neither of whom concluded that Alker had the severe physical limitations that Dr. Graf found.

In addition, the ALJ noted that Dr. Graf's opinions were contradicted by Alker's own statements.  Alker reported significant improvement after going to physical therapy, such that he had limited pain and far fewer limitations after only a few sessions.  In addition, Alker went to the gym frequently, and engaged in several daily activities which were inconsistent with Graf's findings of severe limitations, such as walking, shopping, and doing household chores.

Alker disputes the ALJ's findings concerning Alker's exertional limitations.  The record, however, supports the ALJ's summary of the evidence and the ALJ's residual functional capacity assessment, which requires that it be affirmed.  See Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st

Cir. 1991); <u>Evangelista v. Sec'y of Health & Human Servs.</u>, 826 F.2d 136, 141 (1st Cir. 1987).

<u>Conclusion</u>

For the foregoing reasons, the plaintiff's motion to reverse the Commissioner's decision (document no. 10) is denied.  The Commissioner's motion to affirm (document no. 14) is granted.

The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

February 20, 2014

cc:  Stephan Patrick Parks, Esq.
     Robert J. Rabuck, Esq.